UWHIPPLE, J.
In this tax assessment case, plaintiff, Cosmar Company, appeals from a judgment of the trial court abating penalties and ordering a partial refund of taxes plaintiff paid under protest to defendant, the Louisiana Department of Revenue and Taxation. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On October 19, 1994, the Department of Revenue and Taxation for the State of Louisiana (“the Department”) issued a proposed assessment to Cosmar Company Joint Venture (“Cosmar”)[1] for certain sales taxes. In response, Cosmar filed a protest with the Audit Review Division of the Department disputing that it owed $86,086.88, consisting of $49,989.45 in taxes, $18,373.51 in interest, and $17,823.92 in penalties for the audit period involved, ie., January of 1991 to October of 1993.
In its protest, Cosmar challenged the Department’s finding that Cosmar’s purchases of the chemicals, Inhibitor 85, Ma-roxal, and Naugard, collectively identified as “DNPC,” were not exempt from taxation as boiler fuels pursuant to LSA-R.S. 47:305 D(l)(h).[2] Cosmar argued that in addition to use as an inhibitor, the DNPC had also been used to heat a boiler. Therefore, these chemical purchases were exempt from taxation pursuant to the provisions of LSA-R.S. 47:305 D(l)(h), which provides that “all energy sources when *648 used for boiler fuels” are exempt from sales and use tax. Cosmar further argued that because the law was clear and unambiguous, it should be applied as written in favor of granting an exemption to Cosmar.
laThe Department rejected Cosmar’s position and denied Cosmar an administrative hearing on the matter. By letter dated February 24, 1995, the Department explained that it “considers the inhibitor, DNPC, as a processing ehemical[,] which is taxable at 4%.” The Department further advised Cosmar that it would proceed with collection in accordance with the audit, pursuant to LSA-R.S. 47:1561. The Department explained that “the Chemicals Inhibitor 85, Maroxal and Nargaur are primarily for purposes other than a ‘boiler fuel’ by the Plaintiff in this matter and should not be exempt for purposes of Louisiana General Sales Tax under the provisions of LSA-R.S. 47:305(D)(l)(a).”
By letter dated May 15, 1995, Cosmar advised the Department that it was exercising its right to pay the contested amount under protest and would proceed pursuant to LSA-R.S. 47:1576, which sets forth the guidelines for remittance of taxes under protest. Thus, Cosmar enclosed a check for the amount of taxes in dispute with interest ($90,053.08) and requested that the funds be held in an escrow account. On June 9, 1995, Cosmar Company filed a “Petition for Refund” naming Ralph Slaughter, Secretary of the Department of Revenue and Taxation, as defendant.[3]
The trial court heard the matter on March 21, 2003, and on April 15, 2003, rendered judgment in favor of Cosmar: (1) ordering a refund in the amount of 1.2% of the tax and interest paid under protest, consisting of $598.78 in tax and $268.08 in interest; and (2) abating 100% of the $17,823.92 in penalties paid under protest and ordering an additional refund of that amount, plus interest from the date of payment. The judgment denied and Ldismissed Cosmar’s claim against the Department for a refund of the remaining amount of tax ($49,299.67) and interest ($22,071.63).
Cosmar filed a motion for a suspensive appeal, challenging the portion of the judgment dismissing its claim for a refund of the $49,299.67 in taxes and $22,071.63 in interest. On appeal, Cosmar asserts the following assignments of error:
1. The Trial Court erred in apparently finding that because this case involved a retail sales tax, controlling precedent on the applicability of the boiler fuel exemption to byproducts, specifically B.P. Oil v. Plaquemines Parish Government, 642 So.2d 1230 (La.1994), was not applicable because B.P. Oil involved a use tax.
2. The Trial Court erred in failing to properly apply the boiler fuel exemption to this case to exempt all of Cosmar’s purchases of DNPC when the undisputed evidence showed that after its use as an inhibitor, all of the DNPC, whether in its original form or as chemically combined with styrene, was used as a boiler fuel.
DISCUSSION
In reviewing a trial court judgment, the appellate courts of the state of Louisiana are authorized by the constitution to review both law and facts. La. Const. Art. V, § 10(B); Bergeron v. Albert, 2002-1955, p. 7 (La.App. 1st Cir. 11/21/03), 861 So.2d 269, 274. A mixed question of fact and law should be accorded great deference by a reviewing court under the *649 manifest error standard of review. Brasseaux v. Town of Mamou, 1999-1584, pp. 7-8 (La.1/19/00), 752 So.2d 815, 820-821.
An appellate court may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In applying this test, a reviewing court must do more than simply review the record for some evidence that supports or controverts the trial court’s findings. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Furthermore, to reverse a factual determination, the appellate court |smust find that a reasonable factual basis for the finding of the trial court does not exist in the record and that the record establishes that the finding is clearly wrong or manifestly erroneous. Mart, 505 So.2d at 1127.
Louisiana law imposes a tax on all sales at retail. LSA-R.S. 47:302 A and 47:331 A. However, the “boiler fuel exemption” exempts from retail sales tax “all energy sources when used for boiler fuel except refinery gas.” See LSA-R.S. 47:305 D(l)(h).[4] On appeal, Cosmar does not dispute that the transactions at issue involved the purchase of the chemicals, Inhibitor 85, Maroxal, and Naugard, identified collectively as DNPC. Cosmar instead argues that although the DNPC was primarily purchased for its use as an inhibitor, its subsequent use as a boiler fuel, whether in its original form or as chemically combined with styrene, renders these purchases non-taxable under the exemption. Cosmar claims in its brief on appeal that it is an undisputed fact that 100% of the DNPC that enters the process ultimately ends in the styrene tar, which fires the burner.
With regard to the trial court’s decision to limit the exemption to 1.2% of the total chemicals at issue, representing the amount of DNPC found by the court to be identifiable DNPC burned as boiler fuel, Cosmar argues in its supplemental brief that in addition to erring as a matter of law in failing to apply the law as written and refusing to grant the boiler fuel exemption to all of Cosmar’s purchases of DNPC, the trial court erred in its factual determination. In particular, Cosmar again argues that all of the DNPC, in one form or another, was used as a boiler fuel after its initial use as an inhibitor in the primary manufacturing process and, further, that the trial court (and the | (¡parties) erred as to the proper percentages remaining.[5] Thus, the issue before us is whether, under the facts of this case, the trial court erred in its determination that only those identifiable portions of the chemicals used as boiler fuel were subject to the exemption, given their primary purpose and use in the manufacturing process.
In rejecting Cosmar’s claim, the trial court stated, as follows:
*650 I don’t really think there’s any big dispute of facts in this case. While the parties may not agree with my interpretation, I don’t see any real difference between the testimony of Mr. [Mark] Gremillion and the testimony of Dr. [Frank] Groves as far as initially how the DNPC is used in the process and the ultimate composition of the styrene tar that is burned.... Mr. Gremillion testified that 1 and 1.2 percent of this tar is what’s considered identifiable DNPC or inhibitors. You can tell after its been recycled through the process ... 1 to 1.2 percent of the tar is recognizable DNPC or inhibitors, the remainder is what he classified as unknown components. It’s got components of the polymers, it’s got components of the inhibitors and it’s matched together. His testimony, [that] 100 percent of the inhibitors that go into the process end up in the tar is the same as Dr. Groves saying that all of the atoms contained in these inhibitors that went into the process end up in the tar. From a factual standpoint right now, I don’t think there’s a major dispute as to this process, what goes in and what the ultimate by-product, the styrene tar, consists of that is used, and I find that there’s no dispute between the parties that ultimately this styrene tar is what’s used as a boiler fuel, is the source of the fuel.
* * *
I’m of the opinion that the primary use of the DNPC was in the manufacturing process used ... as an inhibitor in an attempt to avoid ... and prevent the polymerization or hardening of the styrene; that the subsequent use of the DNPC as a fuel was, first of all, as testified to by both witnesses, not in the form, substance, either chemical or molecular, of the DNPC originally purchased and used in the manufacturing process. (Emphasis added.)
17Relying on the testimony of Mr. Grem-illion, the trial court specifically noted that:
At least 1 to 1.2 percent of identified unused inhibitors, and in this case the DNPC, was in the tar that was used as a fuel source. So for the purposes of the fuel source credit, I will give Cosmar the 1 to 1.2 percent of the DNCP used as a fuel source that is identified as such as an exemption.... I think the testimony of Dr. Groves and Mr. Gremillion are on all fours with regard to what happens during this process.... [T]he court is going to allow them an exemption of 1.2 percent of the total DNPC that was purchased and used in the manufacturing process. The request for the remainder of the exemption of the DNPC purchased and used by Cosmar is going to be denied.
After careful review, we find no error by the trial court in either its factual findings or its statutory interpretation, considering the testimony evidence properly of record and the applicable statutes and jurisprudence.
Patricia Anne Porter, an auditor for the Department, performed the audit of Cos-mar for the period from 1987 through 1989. At the time she performed the audit, she requested information on all chem-icáls purchased. The information she received concerning the DNPC was that it was used solely as a processing chemical. She further testified, however, that had she been informed that it was also used as a boiler fuel, she would have nonetheless considered it taxable because she was instructed to look to the principal use of the chemical to determine its taxability.
Dr. Frank R. Groves, Jr. testified on behalf of the Department as an expert witness in chemical engineering. Dr. *651 Groves explained that in the manufacturing phase, the DNPC was used as an inhibitor added to the crude styrene in order to prevent polymerization from occurring in the styrene process. He explained that without the addition of DNPC, the styrene would spontaneously react with itself, a process called polymerization, which tends to “foul up” the equipment and can potentially cause a plant shutdown. He stated that the inhibitor used in this instance, ie., the DNPC, works by reacting with |sextremely reactive particles, called “styrene free radicals,” which start the polymerization process and appear spontaneously in the styrene. By reacting chemically with the styrene free radicals, the DNPC eliminates them, thus preventing polymerization from occurring.
Dr. Groves further explained that the chemical reaction between the DNPC and the polymer in the crude styrene forms a new chemical compound that differs from the original DNPC and consists of a different chemical composition from either DNPC or styrene. He described this compound as a “styrene tar.” Dr. Groves testified that this styrene tar was the material ultimately used as an energy source to provide heat in the boiler. Other than its use as a fuel, he considered it a waste product. He testified that the contents of the styrene tar burned as a fuel source constituted an entirely different material, involving various components that differ from the chemicals purchased by the taxpayer and put in at the beginning of the process to prevent polymerization.
Mark Gremillion, employed by Cosmar as a production manager at the time of the audit in question, also testified. He stated that his responsibilities included oversight of the operation of the styrene plant and selection of the type of inhibitors used therein, ranging from the input of raw materials through the firing of the boiler at the facility. Gremillion testified that his decision to use DNPC as an inhibitor was based in part on the fact that the styrene tar could be used as a fuel source. Grem-illion agreed that the input of these chemicals in the manufacturing phase prevents polymerization, but noted that DNPC ends up in the styrene tar. He testified that the inhibitors that are burned add energy to the boilers and that the DNPC purchased by Cosmar becomes “a part of an energy source that’s fired in the boiler.”
|9He further testified that “[w]hen you use the inhibitor to inhibit the polymerization, it breaks down and becomes part of the styrene tar ... you can’t measure it as DNPC, but it is part of the styrene tar ... it becomes other compounds.” He stated he did not have an analysis of the intermediate compounds, which composed the styrene tar. Notably, he testified that only 1 to 1.2 percent of the unused inhibitors contained in the tar is clearly identifiable as DNPC. According to Gremillion, the other 88 to 99 percent of the styrene tar is made up of polymers or unknown substances that contain the inhibitors as well as other substances from the tar.
The test set forth by the Supreme Court for determining whether an item is subject to sales/use tax is the “purpose” for which it was purchased. See Traigle v. P.P.G. Industries, Inc., 332 So.2d 777 (La.1976); Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1981) (on rehearing). While we find it laudable that Cosmar was able to use the styrene tar (and the portion of the DNPC contained therein) to fire the boiler, the evidence overwhelmingly shows that the chemicals collectively identified as DNPC were purchased primarily for use as an inhibitor. And, as the Supreme Court has recognized, the proper inquiry is the purpose for which the DNPC was bought. See Vulcan Foundry, Inc., 414 So.2d at 1198.
*652 In Vulcan Foundry, Inc., the Supreme Court granted rehearing to determine whether coke used by Vulcan in its manufacturing process was exempt from Louisiana sales/use tax. Vulcan Foundry, Inc., 414 So.2d at 1196. After reviewing the pertinent facts therein, the Court determined that the primary purpose for which the coke was bought was to heat and melt scrap iron, not to operate the boiler. Rejecting the claim for the exemption from taxes, the Court noted “[t]he legislature did not exempt coal (or its derivative, coke) when used for any purpose other than boiler fuel.” Vulcan Foundry, Inc., 414 So.2d at 1198. The Court accordingly concluded that “Vulcan failed to clearly, unequivocally and affirmatively establish that it was entitled to this exemption from sales/use tax.” Vulcan Foundry, Inc., 414 So.2d at 1198. (The Court then focused its discussion on the applicability of Vulcan’s purchase of coke to the reprocessing exclusion, which is not at issue herein.)
Despite this evidence that the DNPC was used as an inhibitor in the manufacturing process, and that only 1 to 1.2 percent of the total molecules that enter the boiling process could be identified as DNPC, Cosmar contends it is entitled to an exclusion nonetheless, citing BP Oil Company v. Plaquemines Parish Government, 93-1109 (La.9/6/94), 651 So.2d 1322 (on rehearing) and its discussion of Vulcan Foundry, Inc. We disagree.
At the outset, we note that the Court in BP Oil Company was faced with the determination of whether to apply a reprocessing exclusion, rather than the application of the boiler fuel exemption at issue herein. As noted therein, the reprocessing exclusion was designed to eliminate the tax on the sale of a material purchased for further processing into finished products and to place the tax on the ultimate consumer of the finished product processed from the raw material. BP Oil Company, 651 So.2d at 1330.
In BP Oil Company, the Supreme Court distinguished its holding in Vulcan Foundry, Inc. on the issue of the applicability of a reprocessing exclusion, and determined that a reprocessing exclusion was not applicable under the facts of the case, given that the two chemicals at issue were not being processed into any products for sale at retail.[6] In making that | ^ 1 determination, the Supreme Court specifically recognized that the use made of the tangible personal property is paramount to the determination of its taxability, stating as follows:
The focus must be on the use of the personal property sought to be excluded from taxation, rather than on the raw material which produces the personal property as a by-product of the refining process. Although the crude oil was purchased for “further processing into articles of tangible personal property for sale at retail,” the use of the by-products of the processing is the event sought to be taxed in this case. (Emphasis added).
BP Oil Company, 651 So.2d at 1330, n. 10.
Cosmar argues that the rule set forth by the Supreme Court in BP Oil Company and other cases is “that the purpose for which a source of boiler fuel is purchased is irrelevant; rather it is the use of the energy supplied by that source which determines whether an item is exempt.” *653 Cosmar argues that the Court’s holding in BP Oil Company mandates that:
1. For purposes of the boiler fuel exemption, it is not the purpose for which the energy source was purchased that matters; rather it is the ultimate use of the energy source as a boiler fuel which controls taxation; and
2. In order to qualify for an exemption or exclusion, it is not necessary that an item remain in its original state; and
3. The amount of the item used for the exempt purpose has no bearing on the amount of the tax deduction.
We find no merit to these assignments. The trial court distinguished BP Oil Company from the instant case by stating, “[t]he question I now find is this is not ... East Baton Rouge Parish trying to assess a use tax on this by-product, but the state assessing the retail sales — the retail tax on the purchase of DNPC.” The trial court specifically recognized that “the primary use of the DNPC was in the manufacturing process used as an inhibitor in an attempt to avoid ... and prevent the polymerization or hardening of the styrene” and “the subsequent use of the DNPC as a fuel was, first of all, as testified to by both 112witnesses, not in the form, substance, either chemical or molecular, of the DNPC originally purchased and used in the manufacturing process.”
Relying on the testimony of Dr. Groves, the trial court held:
[t]he DNPC at the time it’s in this styrene tar is different from the ... DNPC that went into the process chemically, in appearance, pumpability (sic), atom and molecular structure. It, in essence, has been combined with the polymers, as testified to by Mr. Gremillion, and forms a new chemical compound which is different from the DNPC. And I don’t think that, even as written, the exemption can be construed broad enough by this court to say that the use of this tar containing a minor identifiable percentage of DNPC constitutes a use of DNPC as a source of boiler fuel entitling them to the entire exemption.
In awarding Cosmar the credit for that portion of the chemicals purchased that it found was used as a fuel source, the trial court stated:
However, again trying to reconcile the language between Vulcan and BP, Mr. Gremillion testified that at least 1 to 1.2 percent of identified unused inhibitors, and in this case the DNPC, was in the tar that was used as a fuel source. So for the purposes of a fuel source credit, I will give Cosmar the 1 to 1.2 percent of the DNPC used as a fuel source that is identified as such as an exemption.
On review, we find the trial court correctly applied the exemption, limited to the 1.2 percent of the total chemical purchases at issue. It is well-settled that exemptions from taxation are strictly construed against the taxpayer claiming the benefit thereof and must be clearly, unequivocally, and affirmatively established by the taxpayer. Johnson v. New Orleans Charities Building Corporation, 2000-2772, p. 5 (La. App. 1st Cir.2/15/02), 812 So.2d 741, 744. Here, the trial court obviously relied on the expert opinion of Dr. Groves that the newly composed styrene tar, as opposed to DNPC, was ultimately the energy source used to provide heat in the boiler. In light of the testimony and evidence herein, and the manifest error standard that we are bound to apply to the trial court’s factual findings herein, we are unable to say that the trial court was manifestly erroneous in its factual findings. Moreover, we find no error |13by the trial court in its refusal to grant the boiler fuel exemption from sales *654 tax for the total amounts of DNPC purchased.
After a thorough review of the record, we find that there is a reasonable basis to support the finding of the trial court that the styrene tar constituted the actual fuel source. Further, we find no error in the trial court’s application of the statutory exemption to only those amounts or percentages of the total chemicals purchased that were clearly established by the evidence of record as being present in the styrene tar and actually used as boiler fuel.
These assignments lack merit.
CONCLUSION
Based on the above and foregoing reasons, the April 15, 2003 judgment of the trial court is affirmed. Costs in the amount of $1,165.29 are assessed against the appellant, Cosmar Company.
AFFIRMED.

. According to the Department's brief, Cos-mar is the trade name for a joint venture involving Fina Corporation and General Electric Corporation, and owns and operates a chemical plant in Louisiana for the manufacture of styrene.

. Louisiana Revised Statutes 47:305 D(l)(h) is cited by the parties as “the boiler fuel exemption.”

. The record reflects that Cynthia Bridges, Secretary of the Department of Revenue, State of Louisiana, was subsequently substituted as defendant in place of Slaughter.

. A tax exemption is a provision that exempts from tax a transaction, which would, in the absence of the exemption, otherwise be subject to tax. Kerr-McGee Corporation v. McNamara, 2000-0770, p. 10 (La.App. 1st Cir.6/22/01), 826 So.2d 1, 7.

. Cosmar claims in its post-argument brief that its recent subsequent testing now shows the amount of recognizable DNPC to actually be 6.66% and that this percentage should be used as the exempt portion, or the matter should be remanded in the interest of justice. We decline to amend or remand on this basis. Any evidence or indication of the results of any subsequent testing is not part of this appellate record and, accordingly, is not properly before us for consideration in our review of this matter. We decline to consider the attachments to Cosmar’s post-argument brief insofar as they relate to matters outside the appellate record and the scope of our review.

. The Supreme Court stated in BP Oil Company, "In Vucan Refineiy (sic), this court held that the reprocessing exclusion did not apply to coke which was bought primarily as a fuel for melting scrap iron in the manufacture of manhole covers, although a very small portion of the coke was incorporated in the final product and beneficially provided needed carbon to the product.” (Emphasis added). BP Oil Company, 651 So.2d at 1330, n. 10.