CALLOWAY, J., Ad Hoc.
hThe plaintiff, Graphic Packaging International (“GPI”), filed suit against the City of Monroe, as well as the City of Monroe Tax and Revenue Division and its administrator, Timothy Lewis (referred to collectively as “the city”), seeking a refund of its payment of >2007 sales and use taxes for certain raw materials used in its manufacturing process and for other items. GPI claimed that the raw materials were subject to the “further processing exclusion.” After a bench trial, the trial court ruled in favor of GPI ordering the city to refund *502 2007 sales and use tax overpayments in the amount of $353,292.39, plus interest, attributable to raw materials sodium hydroxide/caustic soda, sodium hydrosulfide, and emulsified sulphur (hereafter “the chemicals”). However, the trial court denied GPI’s claim for a refund of 2007 sales and use taxes paid on repulpable tape and professional services. The city appealed, and GPI answered the appeal. For the reasons' explained in this opinion, we affirm the trial court’s judgment.
FACTS
In its petition for refund filed on July 5, 2011, GPI, a paperboard products manufacturer in Ouachita Parish, alleged that it erroneously paid sales and use taxes to the city in 2007. The petition stated that the taxes were attributable to chemicals purchased for further processing and- other nontaxable transactions. As shown- by the petition, GPI first requested a refund in the amount of $2,263,128.37 by. letter to the city on December 30, 2010. The city denied the refund request on April 5, 2011. GPI then requested a hearing pursuant to La. R.S. 47:337.81(A)(1), but no hearing was held or decision rendered within 30 days of the- request as required by 12statute. When the city failed to respond, GPI filed suit in district court.
The city responded with an exception' of prescription. . On July 9, 2012, the district court denied that exception. Thereafter, the city answered the petition on April 30, 2013.. ...
A three-day bench trial was ■ held • on November 12, 13 and. 14, 2014. By this time, GPI had reduced its refund claim to $398,655.21, plus statutory interest, which included $353,292.39 for taxes attributable to-the chemicals, $9,686.34 for taxes attributable to repulpable tape, and $35,676.48 for taxes on professional services. On January 28, 2015, the trial court gave reasons for judgment, providing in pertinent part:
Plaintiffs raw materials refund claims are based on the “further processing exclusion” ’ found in La. R.S. 47:301(10)(C)(i)(aa) and involve sodium hydroxide/NaOH (caustic soda), sodium hydrosulfide/NaHS (NaSH) and emulsified sulfur. The Court must determine whether the raw materials purchased by Plaintiff and utilized in the manufacture of their products are excluded from sales and use tax as materials purchased for further process.
The Supreme Court, in [International Paper v. Bridges, 2007-1151 (La.1/16/08), 972 So.2d 1121], held that raw materials “further processed” into end products are excluded from the sales and use tax provisions when (1) the raw materials become recognizable and identifiable components of the end products; (2) the raw materials are beneficial to the end products; and (3) the raw materials are material for further processing, and as such, are purchased with the purpose, but not necessarily the primary purpose, of inclusion in the end products.
Ken Meissner, an employee of Plaintiff,, as well as Dr. Joseph Genco, Plaintiffs expert, testified that sulfur and sodium remain in the end product. Additionally, Defendant’s expert, Dr. Richard,.Venditti, admitted that sodium and . sulfur existed in the end product. That is all that , is required by. the first element of the Bridges test. There is no threshold amount that must be met. Plaintiff must merely prove that the raw materials are recognizable and identifiable components of the end product.
- With regard to the second element of the Bridges test, Plaintiff alleges that the raw materials were beneficial to its end product, specifically with regard to *503 mass, conductivity, sizing and strength properties. The raw materials add mass to the product sold, resulting lain over $2.8 million in revenue each year.
Another benefit derived from the raw material is conductivity. The testimony presented by Plaintiff indicated that sodium is a conductor of electricity which assists customers and consumers when coming in contact with the product, as it assists in reducing static electricity during the rolling and unrolling of the paper rolls. Defendants’ expert did not dispute that sodium is a conductor of electricity. They sought merely to minimize the benefit Plaintiff derived from it by alleging that Plaintiff conducts no testing to determine what amount of sodium is needed to achieve desired conductivity and that Plaintiff does not design its process or end product to achieved (sic) a requisite conductivity. In other words, because Plaintiff does not specifically test the level of raw material to determine the amount needed to maintain a specific, desired level of conductivity, the Defendant does not believe Plaintiff derives any benefit from the raw material. The Court disagrees. Whether or not testing is performed to ensure certain levels of conductivity are achieved, the conductivity is necessary and a benefit to the end product.
Due to the clear benefit Plaintiff receives from the raw materials’ mass and conductivity, the Court does not find it necessary to go into great discussion of the other benefits claimed by Plaintiff. The Court believes mass and conductivity to be sufficiently beneficial to meet the standard in Bridges. However, the Court does note that Plaintiff also alleges sodium assists in creating good water absorbency (preventing sizing) in the product and that the raw materials in the processing lead to better strength qualities in the end product.
According to Bridges, Plaintiff must prove that the raw materials are purchased for the purpose of inclusion in the end product, but not necessarily for the primary purpose of inclusion in the end product. There is no doubt that the raw materials are necessary for processing; however, they are still recognizable in the end product and the benefits achieved by leaving the raw materials.in the end product would likely no longer exist if those materials were not present. While the sodium and [sulfur] are necessary to create the product, they also benefit the end product for all the .reasons suggested — mass, conductivity, sizing and strength.
The testimony at trial clearly showed that the materials were bought for the purpose, whether primary or not, of further processing into the final product; that the materials were beneficial and that they were recognizable in the final product. The Court finds in favor of Plaintiff with regard to the refund claim for taxes paid on chemical raw materials, in the amount of $353,292.39 plus judicial interest.
Plaintiff claims that its repulpable tape should be considered a raw material and thus excluded from taxes. The Court commends Plaintiff for recycling the tape in an effort to avoid waste, but there was no evidence presented of a benefit achieved by its inclusion in |4the end product. Plaintiffs refund claim in the amount of $9,686.34 is denied.
The trial court also denied GPI’s claim for a réfund of taxes paid on professional services in the amount of $35,676.48. A judgment in accordance with the above reasons was rendered on February 18, 2015.
The city filed a suspensive appeal. The city argues that the trial court erred in *504 finding that conductivity was a benefit achieved by inclusion of the chemicals in the end product and that the chemicals were purchased for the purpose of achieving additional mass and conductivity in the end product. The city also asserts error by the trial court in refusing to order production of evidence it alleges was requested in discovery but withheld by GPI and not learned of until trial, and in refusing to apply the “divisible sales approach” so as to tax that portion of the chemical purchases that do not meet the requirements for the further processing exclusion.
GPI filed an answer to the appeal seeking reversal of the trial court’s denial of its refund claim for taxes paid on repulpable tape and for professional services. However, in its brief, GPI does not assign as error or address the denial of its refund claim for taxes paid on professional services. Pursuant to U.R.C.A. Rule 2-12.4(B)(4), we consider that issue abandoned.
DISCUSSION

Applicable Law

The levying of sales and use taxes by political subdivisions of the state is governed by the Uniform Local Sales Tax Code, La. R.S. 47:337.1 et seq. However, its provisions are not intended to increase or • decrease the amount or type of tax imposed by local taxing authorities or to repeal any | Ktaxes, exemptions, exclusions, credits, rebates, or refunds. La. R.S. 47:337.2(A)(2).
Sales taxes are generally levied upon the sale at retail, use, consumption, distribution, and storage for usé or consumption of tangible personal property. La. R.S. 47:302(A). Tangible personal property is that which may be seen, weighed, measured, felt, touched, or is otherwise perceptible to thé senses. La. R.S. 47:301(16)(a). The basic definition of a sale at retail or retail sale is “a sale to a consumer or to any other person for any purpose other than for resale as tangible personal property!;.]” La. R.S. 47:301(10)(a)(i). However, La. R.S. 47:301(10)(c)(i)(aa) excludes from sale at retail the “sale of materials for further processing into articles of tangible .personal property for sale at retail.” This is the “further processing” exclusion under which GPI seeks a refund of 2007 sales and use taxes paid for chemicals and repulpable tape used in its manufacturing process. .
In International Paper v. Bridges, supra, the supreme court examined its prior jurisprudence addressing the further processing exclusion in Traigle v. PPG Industries, Inc., 332 So.2d 777 (La.1976), and Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1981), and considered the Department of Revenue’s administrative rule[1]-addressing the further |fiprocessing *505 exclusion to formulate the appropriate test to be used in applying the “further processing exclusion.” The court held that raw materials that are “further processed” into end products are excluded from sales and use tax when:
(1) the raw materials become recogr nizable and identifiable components of the end products;
(2) the raw materials are beneficial to the end products; and
(3) the raw materials are material for further processing, and as such, are purchased with the purpose of inclusion in the end products.
In formulating this test, the court soundly rejected the “primary purpose” test distilled from Traigle, supra, and Vulcan, supra, and noted that test to be an expansion of the holdings of those cases.
Because application of the further processing exclusion involves a fact-intensive analysis, the manifest error standard governs our review of the trial court’s decision. (See Bridges, supra, wherein the Board of Tax Appeal’s decision was reviewed for manifest error by the courts.) Under the manifest error standard, reversal of a factual determination requires the appellate court to find that no reasonable factual basis exists for such' finding and that the record establishes the finding of fact to be manifestly erroneous or clearly wrong. Mart v. Hill, 505 So.2d 1120 (La.1987). Where legal error interdicts the fact-finding process, the manifest error standard no longer applies, and the court conducts a de novo' review of the 17record, if complete. Ferrell v. Fireman’s' Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742.

Application of Further Processing Exclusion to the Chemicals

In its ’ assignments of error, the city challenges the trial court’s findings that conductivity was a benefit achieved by inclusion of the chemicals in the end products and that the chemicals “were purchased for the purpose of achieving” conductivity and additional mass in the end products. We note that, although the trial court focused its discussion on the benefits of conductivity and mass, it specifically found that the chemicals “also benefit the end product for all the reasons suggested — mass, conductivity, ‘ sizing and strength.” This is a factual finding by the trial court, not mere dicta as suggested by the city. The city did not assign as error or identify as an issue the findings of sizing and strength as benefits from the presence of the chemicals in the end products, but it did argue in its reply brief that GPI failed to prove they were benefits to GPI’s end products. In the interests of justice, we may consider the city’s argument, but we note that proof of even one benefit to the end product from the presence of the chemicals suffices to satisfy the Bridges test.
As to the city’s argument concerning the purpose prohg of the Bridges test, we find that the city is improperly conflating the benefit and purpose prongs, perhaps in an effort to circumvent the rejection of the “primary purpose” test by the Bridges court. The' city recognizes that the purpose and benefit prongs are separate, yet it ties them together in arguing that GPI failed to meet its burden of proof by failing to show that it purchased the chemicals for the purpose of achieving conductivity or additional mass in the end products. The pertinent inquiry is whether the chemicals were purchased for the *506 purpose of incorporation or inclusion into the end product, not whether they were | ^purchased for the purpose of achieving some specific benefit in the end product. From our review of the record, the trial court’s reasons, and the judgment, we detect no legal error in the trial court’s application of the Bridges test to determine whether the chemicals are subject to the further processing exclusion.
The parties presented extensive and detailed scientific and technical testimony and other evidence regarding the Kraft pulping process utilized by GPI, the involvement of the chemicals in that process, and the inclusion of the chemicals in GPI’s end products. We will not endeavor to recount in great detail that testimony and evidence in this opinion.
GPI’s main witnesses- were Kenneth Meissner (“Meissner”), GPI’s manufacturing manager, -and - Dr. Joseph Genco, an engineer and-the Calder Professor of Pulp and -Paper Technology at. the University of Maine. The city presented its own expert, Dr. Richard Venditti, an engineer and professor at North Carolina State-University. These three witnesses provided the majority of the testimonial evidence concerning the issues on appeal.
Meissner is a mechanical engineer who has worked 33 years in the pulp and paper industry in mills that utilize the. Kraft pulping process. He explained that the chemicals at issue are used in that process. The caustic soda and the sodium hydrosul-fide (NaSH) react with the.lignin,to soften and | abreak it down, while the addition of sulfur allows the process to work without damaging the cellulose. Retaining as much lignin and cellulose as possible increases GPI’s.yields. During the recovery phase of the process when the pulp is washed, some of the chemicals used in the pulping process are recovered for use over and over again, whereas some of. the chemicals are considered losses either.because they are washed down the sewer or, for purposes of the matter at issue, because they remain in.the -end products.. The chemicals that remain in the end products are chemically bound into the pulp during the pulping process. Dr. Genco noted that these chemical reactions are well known. He explained that the chemicals are dual-purpose in that they are used for processing and ■ so that an - amount purposefully ends up in the final products as bound soda through the chemical bonding of the sodium and sulfur into the lignin.
The testimony of Meissner and Dr. Gen-co established that while GPI purchases the chemicals for use in its manufacturing process and actually consumes or loses to the sewer part of these chemicals, that process is designed so that a certain amount of the chemicals as bound soda remains in the final product through chemical reactions during the pulping process. Meissner discussed performing mass balance calculations to determine the amount of chemicals or bound soda that leave with the final paper product and add mass to those products. According to his calculations, GPI’s products contain about 12.8 tons .of soda per day. |inHe testified that on an annual basis, GPI gets 4,672 tons of additional product that sells at an average price of $600 per ton, yielding $2.8 million in revenue for the year. He testified that this is directly related to the chemicals in the final products.
The city argues that GPI could add mass by less expensive means. However, and especially in light of GPI’s evidence of other benefits imparted by the chemicals to its end products, we are not persuaded that this point is relevant to whether the chemicals are further processed. Added mass is just one of the benefits claimed by GPI. Both Meissner and Dr. Genco testified about the various-ways in which the *507 chemicals are beneficial to GPI’s end products by contributing not only mass, but also strength, sizing, and conductivity. Dr. Genco explained that the chemicals give rise to good physical'properties in the end products. Regarding the added mass, discussed above, Dr. Genco explained that sodium helps preserve the bulk. .Besides the additional mass attributable to ’the bound soda, the soda in the final product improves conductivity by helping to maintain the appropriate moisture level so as to limit static electricity, a safety hazard, during the winding-and rewinding of rolls and during use "by its customers. Another benefit identified by Dr. Genco is the inhibition of sizing, meaning that the chemicals inhibit the absorption of liquid or moisture in the end products. The importance of sizing depends on the particular end product, such as layers of liner board that,are going to be glued together to form a box. Less sizing enables the glue to stick. Dr. Genco’s testimony indicates that different products have different sizing requirements or specifications and that the amount of sodium affects the sizing or lack thereof.
The city’s expert, Dr. Venditti, testified that the chemicals are not purchased for inclusion in GPI’s end products. Rather, they are purchased Into make up for the chemicals that are lost from the, pulping process. He indicated that 88 percent of the chemicals are washed away in the sewer during the pulping process. Dr. Ven-ditti also testified that there are other potential sources of sodium and sulfur that end up in GPI’s end products, but he admitted that' the majority is from the chemicals. Regarding the claimed benefits from the chemicals in the end products, Dr. Venditti disagreed that the four benefits identified by Meissner and Dr. Genco are attributable to the presence of the chemicals in the form of bound soda in the end products. He noted the absence of any-scientific literature or internal documents produced by GPI showing that the chemicals contribute the claimed .benefits to the end products. Dr. Venditti described the chemicals as processing aids and stated that the benefits are attributable, -to the processing of the pulp, not the chemicals that'remain in. the end products.
Donald Turk, a paper machine superintendent employed by GPI, testified that he did not know of any testing by GPI to determine whether the chemicals in the form of bound- soda are included in the end products. He knew of no specifications for the amount of chemicals needed to achieve the identified benefits. However, he -did testify that GPI does a conductivity measurement which shows the amount of chemicals retained-in the pulp that goes into the paper machines. Turk also admitted that he has no involvement in the chemical aspects of the pulping process and is not a chemical engineer. > ■ ■
The trial court found that GPI presented sufficient evidence to satisfy 112the Bridges test. Though' noting that it was-impressed with each witness,- the- trial court’s findings show that it gave more credence to the testimony of Meissner and Dr. Genco over that of Dr. Venditti. Credibility determinations, evaluations of expert testimony, and resolutions of conflicts in such testimony are questions for the trier .of fact and are subject to the manifest error standard of review. Foley v. Entergy La., Inc., 2006-0983 (La.11/29/06), 946 So.2d 144. From bur review of the record, we find there to be ample evidence in support of - the trial court’s factual findings.. We detect no manifest error in the findings that • the chemicals at issue are recognizable and identifiable in-the end products; that the chemicals are beneficial to the end products with regard to added mass, conductiv *508 ity, sizing, and strength; and that GPI purchases the chemicals for further processing and with the purpose of inclusion in the end products.
For all the reasons mentioned above and for those set forth in the trial court’s written reasons, we find that GPI is due a refund of 2007 sales and use taxes in the amount of $353,292.39 paid for the chemicals at issue.

Application of the Further Processing Exclusion to the Repulpable Tape

As stated, GPI has appealed that part of the judgment denying its refund claim for sales and use taxes attributable to repulpable tape. Meissner explained that GPI uses repulpable tape, which is cellulose based, to splice or put back together paper that has been cut so that it can go through the winding process. The spliced parts are later cut out before graphics are printed. The cuttings or clippings are recycled as pulp that goes into the manufacturing process. However, Meissner indicated that the | ^recycled tape does not make it to the Kraft process, and he could not identify the tape in GPI’s end products. Similarly, Turk could not identify the repulpable tape as a component of the end product, and he did not know how much mass the repulpable tape added to GPI’s end products.
The trial court determined that the re-pulpable tape is recycled by GPI and that GPI failed to present evidence of any benefit achieved by its inclusion in the end product. While the repulpable tape is fully used by GPI in its manufacturing process, GPI failed to show that the re-pulpable. tape becomes a recognizable and identifiable component in its end products or that it imparts any particular benefits to the end products. The record shows that GPI purchases the tape for splicing cut pieces of product, not for further processing. Considering the minimal evidence on this issue, we do not find manifest error in the trial court’s denial of this claim.

Divisible Sales Approach

The city argues that the trial court erred by failing to apply the “divisible sales approach” so as to refund only taxes paid for that part of the chemicals are further processed. The city’s argument is based on the dissent by Justice Marcus in Traigle, supra, and Cosmar Co. v. Slaughter, 2003-1310 (La.App. 1st Cir.4/2/04), 871 So.2d 646, writ denied, 2004-1558 (La.10/1/04), 883 So.2d 987, which involves a refund of sales tax based on the boiler fuel exemption.-
In Traigle, supra, the supreme court found the defendant manufacturer liable for' sales and use taxes on graphite anodes purchased by it for use in the manufacture of chlorine. The court rejected the | manufacturer’s argument that carbon from the graphite anodes remained in the chlorine and thus the graphite anodes were purchased for further processing. Dissenting in part, Justice Marcus noted that 60 percent of the graphite was processed and became part of the manufactured product, whereas 40 percent was discarded as waste in the manufacturing process. Justice Marcus believed that the manufacturer should be assessed with sales and use tax on only 40 percent of the price it pays for the graphite.
At issue in Cosmar, supra, was the exemption from sales tax of “all energy sources when used for boiler fuel except refinery gas.” La. R.S. 47:305(D)(l)(h). It was not a case applying the further processing exclusion at issue in this matter. Noting that exemptions must be strictly construed against the taxpayer, the appellate court affirmed the trial court’s application of the exemption to 1.2 percent of the chemical purchases at issue.
*509 The courts have not applied the divisible sales approach in a matter involving' the further processing exclusion,- and we decline to do so now. We interpret La. R.S. 47:301(10)(c)(i)(aa) as an exclusion, not an exemption as suggested by the city.[2] The statutory language provides that a sale at retail “does not include” the sale of materials for further processing. This clear and unambiguous language means that sales of materials for further processing are excluded from the sales and use taxes generally levied on the | issale of tangible personal property. Liberally construing the further processing exclusion in favor of the taxpayer, GPI, we find no merit to the city’s argument for application of the divisible sales approach.

Discovery

During Meissner’s testimony, he was questioned about GPI Exhibit 10, a one-page flowchart identified as a mass balance study based on 2007 data. The purpose of the study was to analyze the efficiency of GPI’s washing process and determine what part of the bound soda is washed away versus what part remains in the finished paperboard. At the start of Meissner’s testimony about the exhibit, the trial court sustained the city’s objection to the testimony and required GPI to lay a foundation for Meissner to testify about the document, which he had recently found in GPI’s records. Meissner testified that he did not find that document when he initially looked through GPI’s records to produce the requested in discovery. Instead, about two months prior to trial, he came upon the document in the course of his work. He then provided the document to GPI’s attorney and to the city. When questioned by the city’s attorney, Meissner stated that there were other documents that identified the individuals who did the mass balance analysis.
At the conclusion of Meissner’s testimony, the trial court asked if there was any objection to Meissner being released. The city’s attorney then returned to the matter of GPI Exhibit 10 and Meissner’s testimony indicating the existence of other related documents. The city argued that these other documents were responsive to its discovery requests and asked 11Rfor the opportunity to review them and question Meissner further, if needed. GPI’s attorney argued that it had not withheld any documents and that GPI had produced all responsive documents. Further, Meissner answered all of the city’s questions about GPI Exhibit 10, and his testimony provided • no reasonable basis for the city to assert that documents referred to by Meissner would be responsive to discovery.
The trial court noted that, though-Meiss-ner had not prepared the analysis in GPI Exhibit 10, he was questioned by the city about the calculations. The trial court further noted that GPI Exhibit 10 had been presented to the city’s counsel “some two weeks ago” and that the city had not raised any issue about it in a motion to compel that the court heard that day at the start of trial nor had it mentioned anything about the exhibit during a phone conference with the court on the Monday before trial began. Apparently concluding *510 that the city had the opportunity but did not do anything to address the recently discovered GPI Exhibit 10 prior to its introduction at trial, the trial court denied the city’s request for further discovery.
The city now argues that the trial court erred in refusing to order GPI to produce the other documents Meissner referred to in his testimony as related to GPI Exhibit 10. GPI asserts that it did not learn about these other documents until Meissner testified and that the trial court wrongly concluded it had , the opportunity before trial to address these undisclosed documents.
.A trial court’s rulings on discovery matters are subject to review for |17an abuse of discretion. Hutchinson v. Westport Ins. Corp., 2004-1592 (La.11/08/04), 886 So.2d 438; Wollerson v. Wollerson, 29,183 (La.App.2d Cir.1/22/97), 687 So.2d 663. The mass balance study, GPI Exhibit 10, was provided to the city prior to trial. According to various statements in the record, this was sometime between two weeks and two months prior to trial. Nothing in the record indicates that the city took any action prior to trial to seek further discovery about the exhibit. The city did not seek a continuance for further discovery, and as pointed out by the trial court, the city did not address it in a motion to compel or during a phone conference held prior to the start of trial. The city questioned Miessner about GPI Exhibt 10 and posed a few questions about the related documents mentioned in his testimony. On this record, we find no abuse of discretion by the trial court in failing to order GPI to produce the additional documents mentioned by Meissner as identifying the persons who performed the study documented in GPI Exhibit 10.
CONCLUSION
In conclusion, we find that the trial court did not err in its application of the law governing the further processing exclusion. Its findings of fact and its'determination that the chemicals are subject to the exclusion, whereas the repulpable tape is not, are not manifestly- erroneous. Accordingly, we affirm the trial court’s judgment in all respects.
AFFIRM.

. LAC 61:1.4301 states:
Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. Whether materials are further processed or simply used in the processing activity will depend entirely upon an analysis of the end product. Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does not become a recognizable and identifiable component which is of some benefit to the end product, it is not exempt under this provision. The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further pro *505 cessing and the sale is not exempt under this provision.

. As explained in Harrah's Bossier City Inv. Co. v. Bridges, 2009-1916 (La.5/11/10), 41 So.3d 438, exclusions are transactions that are not taxable Because they fall outside of the statute that provides for the tax and are defined by statute as being beyond the reach of the tax, whereas exemptions are transactions that fall within the ambit of a tax but there has been a statutory decision not to tax such transactions. Exemptions are strictly construed in favor of the state, whereas exclusions are liberally construed in favor of the taxpayer. Id.